Omaha Steaks v. Greater Omaha. I guess all these people were not here to hear you. I thought they'd never leave. Please proceed. Good morning, may it please the court, counsel. My name is Nora Cain, I'm here on behalf of Omaha Steaks International. I thank you for hearing our argument today. The Trademark Trial and Appeal Board began by stating the basic principle that to determine likelihood of confusion that trademark and the mark in the registration must be compared in their entireties. And then went on to do just the opposite. We have limited time and I get your argument about how at least in one or two places it misstated the mark. I'd rather focus on another area, which is the board said we've got a discount, and I think they entirely discounted, correctly if I'm wrong, the evidence that you put on with respect to sales and advertising and expenditures. And why, in your view, were they not justified in doing that? They said because you didn't provide enough specificity with respect to what the advertisements and the sales dealt with, is that right? I have a lot to say about that. I am not sure exactly why they went through and listed the great amount of evidence we put in about the extent of our sales. Were you asking the TTAB to infer that all of that advertising had to do with Omaha Steaks, or was there evidence in the record that that's what you were talking about? I wasn't clear on what was going on here. Did they say, well, you told us there's all this advertising, but we don't know whether or not it has anything to do with the actual mark of Omaha Steaks. There's testimony in the record that every single package, every single bit of advertising that's put out there says Omaha Steaks, and the board was primarily considering the standard word mark. So to say, should I have shown every type of ad that Omaha Steaks has used since 1958 in order to convince the court or the board of what sort of advertising was put on when Todd Simon testified to appearances of ads in major newspapers, major magazines, his personal appearance on several television shows, the 75 retail stores. But what did he say about those ads? Did he tie them to what we're talking about here, which is the Omaha Steaks mark? Yes, he said that every single mention, every single time that they talked about the promotion of the product that they spent $50 million a year on, that Omaha Steaks was the primary, those words and that brand and the Steaks. So what is your understanding of what more the TTAB was requiring you to put on? Well, I'll say... I mean, it's better directed towards your friends, so I'll ask him too, but I'm just wondering what your takeaway is. Well, I'll be interested to hear what my friend says as well, because he never once objected to the evidence about the fame, except to the extent, an objection that was rebuffed about whether Todd Simon was competent to testify about the sales, the budget, the placement, all the various areas. But wasn't the board concerned about the fact that your sales didn't really reflect an annual period? No. You put in statistics about sales during the holiday season. No, there's absolutely evidence in the record of how much was spent per year, and there's absolutely evidence in the record of how much was spent on advertising. What about context? I've read the opinion to be saying that some context needs to be provided to place the raw statistics in context. So, for example, the substantiality of the sales or advertising for comparable types of products or services. That was one of the things they pointed out in J36, and at J37 they talked about the extent to which customers recognize the marks and things like that, or hasn't provided any context for how to translate the evidence of market share to the trademark itself. And to your first point, when the board talked about putting the numbers into context, they cited to Bose, and Bose said, you know, it used to be enough to talk about sales and advertising numbers, period. That's not enough anymore. You have to show us market share. Show us something else. Well, I can't show you market share. We're a privately held company. Been in business for 101 years now. There is nobody that I can go to and say, what are your sales? You know, how much are you spending on advertising? There is no market that I can tell you about in any context unless I subpoena somebody else attempting to compete with us. But do you understand the board's concern about, as Judge Stoll says, context? Because you're assuming, and maybe you're right, there's an inference that $40 to $50 million of sales a year is a great deal in this market of beef. But why are we supposed to infer that in the absence of your telling us that this is sort of a big deal in the context of the product? I do want to say that it's $450 to $500 million in sales. The budget is $40 to $50 million. Well, the question still stands. I just want to be sure that the numbers were clear. I think that you can show that we have shown that our advertising has had an impact, not only on the public to the extent of our sales, but also the fact that popular media, without our requests, without our input, and without our money, has written us into their shows. Seinfeld, West Wing, Dennis Miller, the movies about Schmidt. Do you have an idea, because there wasn't anything in the record, but how many of these retail steak shipping or beef shipping companies exist? I mean, most beef companies are wholesale, right? Well, companies that slaughter animals are wholesale. We don't slaughter animals. We buy beef from other companies, and there are only three or four big players in that field. We're not in that field. My friend's company— So who are you competing against? Grocery stores? No. Right. So is there anyone else in your space is what I'm trying to figure out. I know of a company known as Kansas City Steaks. It's not in the record. I can tell you that in approximately 2001, I saw an article where they talked about a comparison about how they'd like to catch up with us, and at that point, they're millions behind. That's not in the record. Can I ask you something else? Yes. One of the things that was argued by Greater Omaha Below and picked up on in the PTAB's opinion— sorry, PTAB, TTAB, the board's opinion— is something about how in looking at whether a mark is famous and truly famous, you should also look at the fact that Omaha Steaks marks are not inherently distinctive, really focusing on Omaha and Steaks. I was wondering what your take is on that law. What does the law say about when you have a mark that's not as distinctive and you're looking at fame? How much do you take that into account? Because I didn't see that your brief addressed that at all. Well, the law says that when there's a— I disagree that it's a weak mark or that it begins from the point of being a weak mark. I just want to know the law. When I'm looking at and determining whether a mark is truly famous or not, and I see that one of the things that the board relied on is the fact that this is not an inherently distinctive mark, what does the law tell me about how I'm supposed to assess the fame of such a mark? Okay. So first of all, we start with it. It's a composite mark, Omaha and Steaks. You can't dissect it and look at Steaks and say, well, that's generic, that makes it weak. And you can't dissect it and say, well, we look at Omaha and that's only geographically descriptive. You have to compare the two, look at the mark fully, and how do you know whether it's acquired distinctiveness? One of our statutes on the Lanham Act says after a certain amount of time you acquire it. Omaha and Steaks commissioned a survey that showed we'd earned it. And back to this fame point, I feel as if the board put us through a dilution fame test in either or. It went on and on about all the evidence we put in and said, you know, that gives them a pretty recognized degree of recognition in the marketplace, but it's still weak. But that's not the law. I just want to know what the law is, so backing up a little bit. Is there a sliding scale of how much evidence you have to put on for fame depending on where your beginning is, what your mark is, whether it's something unique to begin with or whether it's something that's less distinctive? I wouldn't say that any court or the board has written out a sliding scale of here's the list of evidence you need to show, except to the extent Bo suggested you needed to get outside of sales and advertising budget. I would say that there's a sliding scale of once you put it on, where your mark falls between weak and strong. But you have a registered mark, so there's inherent distinctiveness. There's a presumption of distinctiveness, correct? Yes, after a certain amount of time, we earned that, correct. Yes. Okay, and did you argue that to the board? Yes. That is in the briefing to the board and the argument to the board, and then to supplement that, we commissioned the survey to show that we'd acquired distinctiveness through HalPREP. But the board found flaws in the survey? It completely discounted it. And I appreciate that the board is within its discretion to criticize parts of it. It's hard enough to compete against your opponent when you have to compete against a board that's making all the arguments for your opponent. And the criticism about the survey was that the universe was too small. So you're saying your opponent never argued that the survey was flawed? No, my opponent absolutely argued that the survey was flawed, but didn't put on any evidence. And if an ordinary person looks at the record and is asked, is there substantial evidence to support that the board rejected PERET, what evidence would you find from my friend? You wouldn't find any. Now, the board cited to Blue Man Group in saying it was our burden to prove And you go back and read Blue Man, and Blue Man put on far less evidence and far less quality evidence than Omaha Stakes did, yet the board determined you're not famous, but you've shown that you have a strong mark that deserves recognition. Omaha Stakes put on all the evidence that it did, the evidence that I challenge anyone to come up with another company that's been written into the cultural zeitgeist that Omaha Stakes has. Since this matter's been pending, Saturday Night Live wrote Omaha Stakes into a skit that appeared on May 5, 2018. Yet instead of giving Omaha Stakes the same benefit it gave Blue Man, it said, but you're still weak. On what basis, on what substantial evidence did the board base that? Again, on greater Omaha Packing's argument. No evidence, just argument. Well, you can see that it's your burden. Absolutely. But if the board is going to discount all the evidence that Omaha Stakes has put on, it has to state a reason. It can't just say this wasn't enough under Bose when I submit that we surpass Bose and we surpass the other cases upon which you've found fame. And even if you disagree and don't believe that the evidence establishes fame, certainly it took Omaha Stakes beyond the status of a weak mark. The chart in our brief on pages 19 through 21 compares this case with Coach, Pombe, and Bose. In none of those cases was there any kind of an enumeration of things that should be put out that would guide a litigant to the next stage. Bose had eight years of sales evidence kicked out because they weren't introduced properly at the TTAB, and this court decided one year's evidence of sales was enough. Advertising in three or four magazines and a newspaper, we listed far, far further publications that we've appeared in. We have 18 million existing customers. We send a million marketing emails daily. We have 300,000 to 400,000 customers on our telemarketing list. The unsolicited publicity I've mentioned. Well, I think you should save some of your rebuttal because we've got that information in the record, so why don't we hear from the other side and we'll restore a couple minutes of rebuttal. Thank you. May it please the court. What if we conclude that the board erred in its analysis of fame, that it rejected too readily all the evidence that the mark is famous? Where does that leave you? Well, when you say erred in the determination about fame, fame is a sliding scope as set forth in your Joseph Phelps case, the insignia trademark case, and the board looked at all the evidence that was presented, and frankly the evidence of fame typically is what do customers think, and there's nothing in this evidence before the board about customers. Well, you're not answering my question. I'm sorry. Assume that we think that the board rejected too much evidence of fame. Assume that we think the board should have taken judicial notice of the infringement lawsuits. Assume that we think that the board erred as to fame. Where does that leave you with respect to the rest of the factors? Well, where it leaves us is the question of, is there substantial evidence to support the findings that the board made, particularly about DuPont Factor I, the board found that the marks were not similar, and DuPont Factor VI, the board found that there was use of similar marks on similar goods. It weighed DuPont Factor I and DuPont Factor VI findings. It actually looked at the— You're suggesting that we would not send it back? Instead, we would think that if we think there's a problem with the finding of fame, that we're supposed to re-weigh all of the factors? Is that what you're suggesting? No, I'm saying the issue is, is there substantial evidence to support— I understand. I'm just confused because I thought the question was, assuming that we thought that the board erred in its fame analysis, what do we do with the case? And don't we have to remand? I would say no, because the board is supposed to look at the totality of circumstances. Right, but if we change their finding on one of those circumstances— And I'm saying if you take the totality— The board will look at— This court will look at whether or not the board had substantial evidence. That's the standard of review. Did the board have substantial evidence to make its ultimate finding that there was no likelihood of confusion? And I would say, even assuming your— Okay, well, we have your point. Let me push back a little more on one of the pillars that's still standing in your view, which is third-party use. Why is it correct that they used 118 marks to establish that this was in popular use, third-party use? And by my count, or I think your friend's count, only five of those—they used Omaha. But only five of those marks they used with respect to Omaha had any association with meat. So why is it fair ground for the board to evaluate factor six, I think it is, in DuPont about third-party use and include the overwhelming majority of that use, only the word Omaha, not related to meat? Why is that correct as a matter of law? Because you're picking out one piece of evidence that we've submitted, frankly, to show how weak the word Omaha was. It was not intended to be a DuPont six. Well, didn't the board consider it a DuPont six factor? I don't think so. The board actually mentioned it just in passing one time. We said it showed that 118 people thought the word Omaha meant the city of Omaha. The board did make a finding about the six factor, the number and nature of the similar marks used in— It listed about 20 or 30 of the pieces of evidence that we put in, the Pete's deposition, the many websites, the many showings of third-party uses of similar marks. Well, aren't they required to evaluate factor six? So are you saying they didn't get to evaluate factor six? I don't think that they took the 118 registrations that included disclaimers of the word Omaha as being part of the DuPont factor six evaluation. They took it as part of the number, actually five, showing how weak the mark Omaha is. But they did, under factor six, point to all the other businesses that used the word Omaha in their title. And as far as I can tell, none of those businesses are actually in the retail shipment of beef. There are restaurants. There are wine companies. But they did rely on that. The DuPont rule is similar marks on similar goods. They don't have to be identical goods. They have to be similar goods. The goods, you understand, the registration for Omaha steaks is not limited to anything except meat. And these goods— Well, why is use of Omaha in connection with something that has no relationship to meat or to food whatsoever? Your Honor, I would suggest that all the food, all the Pete's deposition, which had about 13 or 14 examples of uses of the marks that included the word Omaha on various food products, some were steakhouses, some were meat, some were popcorn, some were all kinds of food products. Those are similar—I'm sorry, those are similar goods to meat. Meat is a food— Popcorn is similar to meat? Well, I would suggest, yes, food products. I mean, meat is a food product. We're not talking about automobiles or something. Meat is a food product. You buy it in the store. The kinds of evidence that we submitted in the Pete's deposition were all considered to be food products or food services. So under the DuPont number six, the Pete's deposition was strong evidence, and the Board thought it was very strong evidence. Well, the other—you dismissed the beef issue about the typographical error of the word beef, and I say in our brief that five times, but in fact actually seven times, the Board specified our trademark accurately, and one time they made a typo, and they didn't rely on that typo issue at all. I would suggest that is not a meaningful thing. What I would say, though, is in connection with the Joseph Phelps case, which you decided last year, and which simply says that it's important that the Board not just make a yes-no test on fame, because fame is a sliding scale, and in fact the Board here— What do you mean by fame is a sliding scale? Fame goes from weakness up to strength. It's how much fame. Fame is a relative term, and in this court, when deciding the Joseph Phelps case, you said don't use a yes-no fame test. Isn't that what the Board did here, though? Didn't they analyze it under whether it's famous or not famous? They did at one point, because the notice of opposition says in the allegation that the Omaha Steaks mark is famous. We deny that the Omaha Steaks mark was famous, so the Board properly said they evaluated it and said it's not famous, but they then went on and made eight different fact findings between appendix page 39 and appendix page 51 on the relative fame, the relative renown of the plaintiff's trademark, and they said we're considering it. We're weighing our findings in DuPont I, but no similarity of the marks. We're weighing our findings in DuPont VI, which says that there's a lot of use of a third party of similar marks on similar goods, and we're looking at the renown of the plaintiff's mark, but we are simply finding that on balance in the weight we find for the defendant, and therefore they found no likelihood of confusion. They found that it was not famous. Yes, they did. They didn't find that, well, it's famous, but not that much. They just said there's a reasonable degree of recognition, but it's not famous. It says evidence is not sufficient to support the finding that the marks are famous. Yes, they did find that. That's exactly correct. They did find that the mark was not famous, but they also found that the use of the word Omaha and the use of the word stakes, which makes a very weak combination, it means stakes from Omaha as conceded by the other side, they say that looking at the weight, they weighed both the lack of similarity of the marks and the third party uses, and they said that, in fact, if you look on page 51 of the opinion, they say, in other words, DuPont's Omaha stakes marks are not entitled to such a broad scope of protection that they bar registration. I'm sorry, that's on 45. That they bar registration of every mark comprising in whole or in part the word Omaha. Wait, where are you? I'm sorry, that was 45. But on 51 is more important where they talk about the factors together with the differences in the mark outweighs, this is on 51, outweighs the legal identity of goods and the presumed identical trade channels and the degree, the degree of renown that plaintiff has demonstrated. It says that the plaintiff has demonstrated a degree of renown, and that's the point I'm making that it's not just that they said it wasn't famous, they say actually they showed a degree of renown, but when we look at all of the evidence in its totality, we find there's no likelihood of confusion. So back to the point that Judge O'Malley and I were talking about earlier, the factor six, you agree, right, that there's got to be a similarity of goods. It doesn't have to be identity, but a similarity. So you would say because we're dealing with beef here, any food group, any food or beverage group, what's the similarity, what's the field here? I would say it's food. Including beverage or not beverage? Because I think the board did rely on a wine company. It may have, I'm not sure. But the point in things that you would buy in a grocery store certainly are similar. If you see many uses of the word Omaha as a trademark on goods sold in a grocery store, one of them could be Omaha Steaks, because remember, the Omaha Steaks registration is not limited to anything other than just meat. Where is the example of something that's sold in a grocery store? I'm looking at page 42, JA42. Which example are you referring to for a food product that is sold in a grocery store? Bear with me for a second, 42? You mean 42 in the opinion? The appendix, yeah, the TTAB opinion, page 42. The appendix. Okay, now these were only some of the items. Okay, one was a cafe. Gifts, it was a specialty gift store selling food. Okay, popcorn is sold in a store. No, that's, it's Omaha popcorn was a particular store in a strip mall in Omaha. And I think that you were referring to marks that used the term Omaha for goods sold in a grocery store. Being similar. And I was wondering where that, what you were referring to in particular. I would also say that the Omaha Steakhouse is an example. Omaha Prime, I think it's called Omaha, the third from the bottom. Omaha Prime, an elegant steakhouse. They're all, these are all wines that are sold in a grocery store. Casual restaurant. These are all things that are, one could argue, and I did, that they are similar in a general sense. So that when you have a huge amount of third-party use, and we showed a ton of third-party uses on these goods, that customers, this is what the Jack Wolfskin case held, that customers become educated, and you don't have to show the specific amount of everything, but if you have a ton of third-party uses of similar marks, they have the word Omaha, that is powerful in showing evidence as to why the narrowness should be applied, that the amount of fame given to the plaintiff's trademark should be narrowed, because it is not entitled to stop everybody else from using the word Omaha in connection with food products. Thank you. Thank you. Did I have any left? Yeah, we'll restore two minutes of rebuttal. Oh, thank you. Could I ask you a question about, I just want to know for clarification, what were you seeking judicial notice of? The existence of litigation? The existence of a particular kind of litigation? It was just unclear to me what you were seeking with the request for judicial notice based on the identification of a bunch of cases that Omaha stakes had asserted. Thank you. The request for judicial notice was asking the board to take notice that Omaha stakes had filed numerous trademark infringement complaints. And so what would they have to do in order to do that? They would have to look up the pleadings in each of the cases you identified to see that in fact, yes, this is a trademark infringement lawsuit? Part of the judicial notice rule of evidence is to streamline evidence. I wasn't offering the complaints to prove the truth of the matter asserted within them. I was asking the board to take judicial notice without, if I'd put the complaints in, I wouldn't have asked for judicial notice, right? It was so, to not clutter up the record without the only point being... So what did you actually put in? The listing of the litigation numbers, the complaint numbers? Yes, that they could be found on PACER. And I cited two cases in my brief that support doing that. So you put in the caption and the docket number? Yes. And the caption and the case number, and therefore that showed the year and the district court that it was filed in, right? Did you anticipate that they would have to look it up and just verify that it's an infringement suit or were you asking them to take your word for it? As an officer of the court, I think that they can take my word for it. I would rely on my friend to point out to the court, oh, no, those were trade dress, those were patent, those were fill in the blank. They weren't what she said they were. And the reason it wasn't to show that there had been trademark infringement suits filed, well, I shouldn't say that. It was. But what I was trying to show is imitation. With the cease and desist letters and the lawsuits, with the strength of a mark and fame comes imitation. If you're not relying on those complaints for the truth of the matter asserted, then how are you showing imitation just based on the fact that lawsuits have been filed? The diligence and prosecution of the trademarks are shown how. I have testimony that we scour the internet, that we pixel our images, that we write cease and desist letters, that we have lawsuits, presumably that are litigated or settled. I can't, or should I, would the board want to hear about the result of each one if there had been a finding of non-infringement? But where does that factor stand? Because let's assume that we're the only problem we had with this case. Isn't it, couldn't we dismiss it as kind of harmless error? If we accepted everything else the board did here other than not take judicial notice of the number of lawsuits. I mean, that's a pretty insignificant factor in the scheme of things, right? So by itself, one could construe that as being a harmless error. I agree. I agree. And you notice I didn't bring it up. I was going to rely on the brief for it. Judicial notice can be taken at any stage of the proceeding. If this court chooses to do so, it may do so. There were lawsuits filed since the, since the board decision that I included and asked this court to take judicial notice of. It's... Okay, we've exceeded our time and that's our fault and not yours. But you have one other final comment and let's bring this to a close. Thank you. Thank you. We thank both sides and the case is submitted. That concludes our proceeding.